In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-2343

CANDICE MARTIN, individually and as
Executrix of the Estate of Rodney Martin, deceased,

*Plaintiff-Appellee,*

*v.*

GOODRICH CORPORATION, formerly known as
B.F. GOODRICH COMPANY and
POLYONE CORPORATION, individually and as
Successor-By-Consolidation to the GEON COMPANY,
now known as AVIENT CORPORATION,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:21-cv-01323-JES-JEH — **James E. Shadid**, *Judge.*

———————————

ARGUED FEBRUARY 14, 2024 — DECIDED MARCH 6, 2024

———————————

Before SCUDDER, ST. EVE, and LEE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* In Illinois, workers injured on the job
obtain compensation through an administrative scheme. The
relevant agency holds employers strictly liable for this

administrative remedy, but keeps the claims out of court. Much the same arrangement governs diseases contracted on the job—yet unlike accidents at work, the harm from diseases may not manifest for years or decades after employment terminates. The state legislature tried to account for this difference in 2019, but the scope of that fix is uncertain.

This case asks us to resolve that uncertainty. But rather than risk unsettling Illinois's intricate compensation apparatus, we defer to the experts and certify three related questions to the Illinois Supreme Court.

## I. Background

Appellate jurisdiction here rests on 28 U.S.C. § 1292(b), which allows for interlocutory appeals when the district and appellate courts agree—so long as the appeal meets certain criteria. The jurisdictional hook requires that the case present "a controlling question of law," tricky enough to leave "substantial ground for difference of opinion," whose resolution will "materially advance the ultimate termination of the litigation." *Id.* When we take an appeal this way, the district court identifies for us which "controlling question[s] of law" the case presents—but our authority extends past answering those questions. Instead, any "appeal under § 1292(b) brings up the whole certified order," *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 974 (7th Cir. 2021), often a ruling on a motion to dismiss. *See, e.g., Ashley W. v. Holcomb*, 34 F.4th 588, 591–92 (7th Cir. 2022). That accounts for our authority to "address any issue fairly included within the certified order." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996).

This case satisfies the § 1292(b) criteria: resolving the complicated legal issues may well end the case. We start, then, with the pertinent Illinois law.

**A. Legal Background**

When Illinois employees contract a disease arising out of or in the course of their employment, they can seek compensation under the Workers' Occupational Diseases Act, 820 ILCS 310/1 *et seq.* (the "ODA"). That law borrows its structure from the Worker's Compensation Act, 820 ILCS 305/1 *et seq.* "In enacting these statutes, the General Assembly established a new framework for recovery to replace the common-law rights and liabilities that previously governed employee injuries." *Folta v. Ferro Eng'g*, 43 N.E.3d 108, 112 (Ill. 2015).

At a basic level, the statutes hold an employer "liable to pay compensation to his own immediate employees" for their injuries, 305/1(a)(3), and diseases, 310/7. To seek their compensation remedy, workers apply to the Illinois Worker's Compensation Commission. In turn, that body awards or denies compensation "upon the facts and circumstances of each particular case." *Folta*, 43 N.E.3d at 118.

The issues here implicate the interplay of four aspects of the ODA: (1) temporal limitations hampering old claims, (2) exclusivity provisions channeling claims into the administrative compensation protocols, (3) age-old exceptions to that exclusivity, and (4) a 2019 statute adding a new exception.

**1. Temporal Limitations**

A worker who contracts a disease on the job must remain mindful of two deadlines. The first appears at 820 ILCS 310/1(f) ("1(f)"). We discuss this section first because it begins to run before its companion. Its relevant text follows:

> No compensation shall be payable for or on ac-
> count of any occupational disease unless disa-
> blement, as herein defined, occurs within two
> years after the last day of the last exposure to the
> hazards of the disease.

Put in plain language, an employee cannot obtain compensa-
tion unless she becomes disabled within two years of her last
exposure to the hazard.

> The second timing provision appears at 820
> ILCS 310/6(c) ("6(c)"). This section provides in
> relevant part:

> In any case, other than injury or death caused
> by exposure to radiological materials or equip-
> ment or asbestos, unless application for com-
> pensation is filed with the Commission within 3
> years after the date of the disablement, where
> no compensation has been paid, or within 2
> years after the date of the last payment of com-
> pensation, where any has been paid, whichever
> shall be later, the right to file such application
> shall be barred.

In other words, an employee generally must apply for com-
pensation within three years of becoming disabled. But if her
employer pays some compensation, she may file her applica-
tion up to two years after the last compensation payment.

These two deadlines work differently. For 1(f), the timing
of claim filing is immaterial. It requires only that the disable-
ment occurs within two years of exposure; the clock starts
with the end of exposure and counts until disablement. Then
there is 6(c), which by contrast does focus on the claim's

timing. Starting from the disablement that caps off the 1(f) period, the worker typically has three years to apply for compensation consistent with 6(c)'s mandate. Any application after that date is time-barred.

We pause here to note another distinction between these provisions. Where 6(c) instructs that untimely claims "shall be barred," the sole consequence 1(f) imposes is that "[n]o compensation shall be payable." The statutes impose different ramifications for a missed deadline.

### 2. Exclusivity Provisions

The ODA contains exclusive remedy provisions that limit the process for most workers to the statute's prescribed channels. Two provisions preclude employees subject to the ODA from seeking compensation outside of the statutory scheme.

For one, "there is no common law or statutory right to recover compensation or damages from the employer" or related entities. 820 ILCS 310/5. Pairing that with the statute's other dictate, that "the compensation herein provided for shall be the full, complete and only measure of the liability of the employer [and those other entities] … in place of any and all other civil liability whatsoever," 820 ILCS 310/11, gives a complete picture of the ODA's exclusivity provisions. *See Folta*, 43 N.E.3d at 112.

Just five years ago, there would have been little more to say. In 2019, however, the Illinois legislature passed a statute providing for an exception to these provisions. Today, both exclusive remedy provisions apply "[e]xcept as provided in Section 1.1," the new amendment making clear that the exclusivity provisions are not absolute. We will address this exception further below.

### 3. Historical Exclusivity Exceptions

Even before the legislature narrowed the exclusivity provisions, Illinois courts acknowledged certain limits to them. *See Collier v. Wagner Castings Co.*, 408 N.E.2d 198, 202 (Ill. 1980). A plaintiff could avoid the exclusivity provisions by proving any of the following: "(1) that the injury was not accidental; (2) that the injury did not arise from his or her employment; (3) that the injury was not received during the course of employment; or (4) that the injury was not compensable under the Act." *Meerbrey v. Marshall Field & Co., Inc.*, 564 N.E.2d 1222, 1226 (Ill. 1990).

In *Folta*, the Illinois Supreme Court addressed the last exception—the one for injuries "not compensable" under the ODA. 43 N.E.3d at 113. James Folta was a product tester for Ferro Engineering, a position that put him in contact with asbestos throughout his four-year employment. *Id.* at 110. He left the job in 1970. *Id.* Under 6(c), asbestos exposure works a little differently from other hazards. Claimants like Folta have 25 years from their last *exposure*, where others' claims are barred 3 years after *disablement*. Section 6(c) thus barred Folta's claim for compensation from 1995 on, since it stemmed from asbestos exposure. Mr. Folta received his mesothelioma diagnosis in May 2011, though—long after the 25-year asbestos bar descended. *Id.* Even so, he sued Ferro Engineering, and after his death his widow pressed on with the case. *Id.* They submitted that because of 6(c)'s limitation, compensation was not available to Folta. There was never a time when he both knew of the harm and could seek compensation consistent with 6(c).

The *Folta* court stressed that 6(c) is a statute of repose. As such, it effectuates a legislative intent "to provide an absolute

definitive time period within which all occupational disease claims arising from asbestos exposure must be brought." *Id.* at 117. Put another way, the statute's purpose was not to ensure Folta's diligence. Instead, it exalted certainty, aiming "to extinguish the employer's liability." *Id.* That certainty would vanish if plaintiffs like Folta could bring their claims in court after 6(c) barred the ODA's statutory remedy. *Id.* at 117.

Further, the caselaw on the "not compensable" exception had construed it to encompass only those injuries that could not "categorically fit[] within the purview of the Act." *Id.* at 114. Even in cases where 1(f) supplied the temporal bar, the court reasoned that its "temporal limitation on the availability of compensation benefits" did not "remove occupational diseases from the purview of the Act." *Id.* at 118. Same result: the exclusivity provisions apply.

All this added up to a loss for Folta. The court was "cognizant of the harsh result" its interpretation had worked. *Id.* Its hands were tied, though: any call for a change in the law was "more appropriately addressed to the legislature." *Id.*

### 4. Exception 1.1

The legislature answered the call four years later, in 2019, with 820 ILCS 310/1.1, or "Exception 1.1." That law explains that the exclusivity provisions in the ODA "do not apply to any injury or death resulting from an occupational disease as to which the recovery of compensation benefits under this Act would be precluded due to the operation of any period of repose or repose provision." 310/1.1.

So when 6(c)—a "statute of repose" and thus a "period of repose"—bars a claim, *see Folta*, 43 N.E.3d at 117, the

exclusivity provisions fall away. It is less clear how 1(f)'s "temporal limitation" interacts with Exception 1.1. *Id.*

**B. Factual Background**

That brings us to this case. Rodney Martin was a lot like James Folta—in the late 1960s and early 1970s, he worked with a dangerous material. For Rodney, it was vinyl chloride monomer ("VCM"), a petroleum-derived chemical essential to the production of polyvinyl chloride, more familiar as PVC. VCM is allegedly linked to angiosarcoma of the liver. At all relevant times, Rodney worked for defendant Goodrich Corporation; he started there in 1966 and retired in 2012. Until 1974, his work entailed exposure to VCM, but after that Goodrich abated its use of the chemical.

In 2019 (after Exception 1.1 passed) Rodney's doctors diagnosed him with angiosarcoma of the liver. He passed away in 2020. This suit followed in November 2021.

**C. Procedural Background**

Rodney's widow, Candice Martin, sued Goodrich and joined PolyOne Corporation—a company that had bought much of Goodrich's PVC business—as a defendant. Her complaint invoked Exception 1.1 to avoid the exclusivity provisions. Later, PolyOne moved to dismiss for lack of personal jurisdiction. For its part, Goodrich moved to dismiss under the exclusivity provisions. It argued 1(f) was not a statute of repose, and that 6(c) did not bar Martin's claim—and thus Exception 1.1 did not apply. In the alternative, it argued that using Exception 1.1 to revive Martin's claim would infringe its due process rights under Illinois's constitution. The district court denied these motions and set the case on track for trial.

Goodrich asked the district court to certify its legal questions to us under 28 U.S.C. § 1292(b). The court agreed to do so, finding two questions that implicate "a controlling question of law" whose resolution would "materially advance the ultimate termination of the litigation" and thus fit the bill for certification. We agreed to take the appeal. The district court's order certified two questions:

1. Whether 820 ILCS 310/1(f) is a statute of repose for purposes of § 310/1.1?
2. Whether applying 820 ILCS 310/1.1 to allow Plaintiff's civil case to proceed would violate Illinois's constitutional substantive due process?

## II. Analysis

We think the interconnected statutory provisions in the ODA present three questions. Each gives us pause. Together, they present a roadmap to handling claims for asbestosis, angiosarcoma, and other diseases that manifest only belatedly. Given the number of cases where this roadmap will chart the course for courts and litigants—plus Illinois's policy interests in its contours—we find each question fit for certification.

We reach this conclusion by looking to Illinois's factors for selecting certification-worthy questions. The questions must be potentially "determinative" of the case, and there must be "no controlling precedents" in the Illinois Supreme Court. Ill. Sup. Ct. R. 20(a). And we have our own guiding lights. "Most important[]" among them is that we be "genuinely uncertain about the answer to the state-law question." *Jadair Int'l, Inc. v. Am. Nat'l Prop. & Cas. Co.*, 77 F.4th 546, 557 (7th Cir. 2023) (cleaned up). The next consideration turns on the nature of

the issue: if it is "an important issue of public concern" and "likely to recur," certification is a better bet. *Cutchin v. Robertson*, 986 F.3d 1012, 1028 (7th Cir. 2021). We also check and see if the question might be of interest to the state supreme court—further favoring certification if it's likely "the result of the decision in a particular case will exclusively affect the citizens of that state." *Id.* at 1029.

### A.  1(f) and Statutes of Repose

Martin relies on Exception 1.1 to press her claim. To succeed, she must establish that any application for compensation benefits "would be precluded due to the operation of any period of repose or repose provision." 820 ILCS 310/1.1. If there is such a provision here, it is 1(f). No one argues 6(c) bars Martin's claim, which she brought within three years of Rodney's diagnosis. And so we ask if 1(f)—which the Illinois Supreme Court has called a "temporal limitation," *see Folta*, 43 N.E.3d at 118—is a "period of repose or repose provision."

Lacking further guidance from the Illinois Supreme Court, we are mindful that "the rulings of the state intermediate appellate courts must be accorded great weight." *State Farm Mut. Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001). But they point in both directions. Some recognize, for example, that 1(f) "operates as a statute of repose" (at least in terms of tolling). *Dickerson v. Indus. Comm'n*, 587 N.E.2d 1045, 1047 (Ill. App. Ct. 1991). At the same time, others describe the provision as "a condition precedent to recovery." *Docksteiner v. Indus. Comm'n*, 806 N.E.2d 230, 234 (Ill. App. Ct. 2004). The cases leave us at an impasse.

Other avenues meet their own dead ends. We know that in Illinois, "a statute of repose *extinguishes the action* after a

defined period of time." *Evanston Ins. Co. v. Riseborough*, 5 N.E.3d 158, 164 (Ill. 2014) (emphasis added). The very "right to bring an action is terminated." *Id.* But that does not resolve this case. While 1(f) denies "compensation," one remedy, without explicitly barring an action, no other remedy exists. We cannot discern if the Illinois courts would conclude that barring a sole remedy counts as "extinguish[ing]" an action.

In short, we are uncertain. And the stakes on this question are high, both for this case and other long latency cases. If 1(f) does not fit in the statute, Martin and many others lose. To underscore the magnitude of this question, consider how it came about. The *Folta* court granted discretionary review to establish limits on plaintiffs' recovery, even as it regretted the "harsh result." 43 N.E.3d at 118. The legislature responded with Exception 1.1, and the governor signed on. All three state branches agree: the ODA's interaction with long latency diseases is an important policy question.

So we certify this first question: *Is 1(f) a "period of repose or repose provision" for 310/1.1 purposes?*

## B.  Retroactivity and Statutory Interpretation

Goodrich identifies another challenge for Martin: Exception 1.1 may not apply here. After all, Rodney's VCM exposure occurred decades before its enactment. In a line culminating in *Perry v. Department of Finance and Professional Regulation*, 106 N.E.3d 1016, 1026 (Ill. 2018), Illinois courts have distilled their process for addressing this sort of retrospectivity argument. There are (nominally) two steps.

> 1.  The "court first determines whether the legislature has expressly prescribed the temporal reach of the new law." *Id.* (cleaned up).

> If it has, the court fills that express prescription.
> 2. If not, "then the court must determine whether applying the statute would have a retroactive impact." *Commonwealth Edison Co. v. Will Cnty. Collector*, 749 N.E.2d 964, 971 (Ill. 2001). It should then read the statute to avoid those impacts.

We say "nominally" two steps because in practice "Illinois courts need not go beyond step one." *Perry*, 106 N.E.3d at 1026. As it happens, "the legislature *always* will have clearly indicated the temporal reach of an amended statute." *Caveney v. Bower*, 797 N.E.2d 596, 603 (Ill. 2003). That is because Section 4 of the Illinois Statute on Statutes essentially provides a backstop. It reads:

> No new law shall be construed to repeal a former law, whether such former law is expressly repealed or not, as to any offense committed against the former law, or as to any act done, any penalty, forfeiture or punishment incurred, or any right accrued, or claim arising under the former law, or in any way whatever to affect any such offense or act so committed or done, or any penalty, forfeiture or punishment so incurred, or any right accrued, or claim arising before the new law takes effect, save only that the proceedings thereafter shall conform, so far as practicable, to the laws in force at the time of such proceeding.

5 ILCS 70/4. Put simply, a substantive statute either pro-claims its own retrospective effect, or cedes that power to Section 4. *See Caveney*, 797 N.E.2d at 602.

The trouble here is it is unclear if Exception 1.1 controls its own fate. It may reach back: it does command that exclusivity provisions "do not apply" where a statute of repose would otherwise bar the claim. That is categorical language—it might express clear intent. Or it might be that those provisions "do not apply" going forward, but still apply to pre-2019 conduct. Then Section 4 would step in and render Exception 1.1 inapplicable here.

Here too the uncertainty butts up against strong Illinois policy interests. If Exception 1.1 applies only prospectively, all those long latency cases dating to the asbestos era lie outside its bounds. In short, the same policy interests supporting certifying the first question apply with near-equal force here.

With that in mind, we certify a second question: *If 1(f) falls within Exception 1.1, what is its temporal reach—either by its own terms or through Section 4?*

### C. Due Process Implications

If Exception 1.1 does apply to this conduct, Goodrich raises another argument, this time under the Illinois Constitution. The company insists that in 1976 it vested a right to be sure Martin would not bring a claim, when 1(f) barred his right to seek compensation and the exclusivity provisions stood in the way of any action in another forum. No doubt: "once a claim is time-barred, it cannot be revived through subsequent legislative action without offending the due process protections of [Illinois's] constitution." *Doe A. v. Diocese of Dallas*, 917 N.E.2d 475, 486 (Ill. 2009). Martin tracks with

that, up to a point. Nevertheless, she resists the conclusion—she claims that Goodrich's right could not vest until Rodney's did, in 2019. By then the legislature had passed Exception 1.1.

This question is no less fraught than the first two. The problem is that 1(f) interacts oddly with the exclusivity provisions. They are separate. It might be, for example, that in 1976 Goodrich vested a right not to pay compensation for Martin's claims, but never vested a right not to face those claims in court. To further complicate the inquiry, there is some authority for Martin's position that Goodrich's rights accrue only when hers do. *See Henrich v. Libertyville High School*, 712 N.E.2d 298, 310 (Ill. 1998) (immunity defense vests "when the cause of action accrued"). But then as we know, a statute of repose nips the cause of action in the bud. It *never* accrues. *See Evanston Ins. Co. v. Riseborough*, 5 N.E.3d 158, 164 (Ill. 2014) ("A plaintiff's right to bring an action is terminated when the event giving rise to the cause of action does not transpire within the period of time specified in the statute of repose."). So, on Martin's theory, it seems Goodrich would never vest a right in the statute of repose.

Yet again, these state law questions are complicated and consequential in equal measure. For just that reason, we certify a third question: *Would the application of Exception 1.1 to past conduct offend Illinois's due process guarantee?*

### III. Conclusion

The resolution of these questions could dispose of an untold number of claims. Each claim, in turn, has big stakes for its plaintiff. Illinois's coordinate branches have signaled the importance of these issues—and for all the weight Illinoisans and their government place on these issues, they have zero

effect outside the state. At the end of the day, these are Illinois questions best left to Illinois judges.

Consistent with that respect for institutional expertise, we recognize there may be better ways to frame this case and its questions. For that reason, we invite the Justices of the Illinois Supreme Court to reformulate our questions if they wish. We have no intention to limit the scope of their inquiry—these questions reflect no more than our own understanding. The Clerk of this Court will transmit the briefs and appendices in this case, together with this opinion, to the Illinois Supreme Court. On the request of that Court, the Clerk will transmit all or any part of the record as that Court so desires.

QUESTIONS CERTIFIED.